NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260247-U

NO. 4-26-0247

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 14, 2026
Carla Bender
4th District Appellate
Court, IL

| | | | |
|---|---|---|---|
| SANDRA L., | | ) | Appeal from the |
| | Petitioner-Appellee, | ) | Circuit Court of |
| | v. | ) | Sangamon County |
| DEON M., | | ) | No. 25FA277 |
| | Respondent-Appellant. | ) | |
| | | ) | Honorable |
| | | ) | Jennifer M. Ascher, |
| | | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The trial court's orders (1) granting petitioner's petition to relocate and
(2) allocating parenting responsibilities and parenting time were not against the
manifest weight of the evidence.

¶ 2         K.E. (born in August 2020) is the son of petitioner, Sandra L., and respondent, Deon

M. In June 2025, Sandra filed a petition to establish parentage of K.E. and allocate sole

decision-making authority and majority parenting time to her. In August 2025, Sandra filed a

petition to relocate K.E. to Norman, Oklahoma. In December 2025, the trial court granted the

petition to relocate and allocated sole decision-making authority to Sandra, along with the majority

of parenting time.

¶ 3         Deon appeals, arguing that the trial court erred by (1) finding it was in K.E.'s best

interests to allow relocation to Oklahoma, (2) finding that granting Sandra sole decision-making

authority was in K.E.'s best interests, and (3) ordering an unreasonable parenting time schedule

that fails to allow him to preserve and foster his relationship with his son. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Procedural History

¶ 6            In June 2025, Sandra filed a petition to establish parentage of K.E. in Sangamon County, seeking to establish Deon as K.E.'s father and allocate sole parental responsibility for decision-making to Sandra and parenting time as the court determined appropriate.

¶ 7            In August 2025, Deon answered the petition, admitting that he was the K.E.'s father and requesting that he be awarded majority parenting time and parental responsibility for decision-making.

¶ 8            Later that month, Sandra filed a petition to relocate to Oklahoma, in which she alleged the following. In May 2025, she married Diego L., who lived in Norman, Oklahoma, and was employed at a construction company owned by Sandra's sister and brother-in-law. Sandra was currently expecting a child with Diego. K.E. had just begun attending kindergarten.

¶ 9            Sandra further alleged that a move to Oklahoma was in K.E.'s best interests because between K.E.'s birth in August 2020 and October 2021, there were "numerous and uncountable occasions" of violence by Deon toward Sandra. Since that time, Deon had visited K.E. only "one to two times per week at his mother's residence." Deon had threatened to kill Sandra multiple times and had "stalked" Sandra as recently as spring 2025 at a local hotel. In April 2024, Deon stabbed a person with a knife while K.E. was with him, resulting in two charges for aggravated battery and unlawful use of a weapon. K.E. received therapy as a result of trauma caused by Deon. Sandra alleged Deon had never paid child support and smoked cannabis in the presence of K.E.

¶ 10            In September 2025, Deon filed an answer to the petition to relocate, requesting the trial court deny the petition to relocate, grant him majority parenting time, and award him sole

decision-making responsibility on a temporary basis.

¶ 11 Deon also filed a motion for temporary relief for allocation of parental responsibilities. He alleged, among other things, he had parenting time with K.E. every week from Wednesday after school until Sunday. Sandra was attempting to "alienate" K.E. from Deon. He requested that the trial court enter an order barring Sandra from relocating K.E. and allocating majority parenting time to him on a temporary basis.

¶ 12 B. The Hearing on the Parties' Petitions

¶ 13 In December 2025, the trial court conducted a hearing on the petition for relocation and allocation of parental responsibilities, at which (1) Diego, (2) Teresa L., (3) Alejandra E.L., (4) Deon, (5) Angelie E.L., and (6) Sandra testified.

¶ 14 1. *Diego*

¶ 15 Diego testified that he was married to Sandra on May 29, 2025. He lived in Norman, Oklahoma. Sandra was pregnant and was due to give birth in March 2026. She was living in Springfield, Illinois, with her parents. The drive to Norman was around nine hours. K.E. lived with Sandra and attended kindergarten in Springfield; he was currently five years old. K.E. would attend school in Norman. Diego worked for a construction company in Norman and had done so for about seven months, earning "[a]round 1,500 or 1,600" dollars a week. Sandra's brother in-law owned the company. If Sandra was able to move to Norman, the household would consist of Diego, Sandra, K.E., and K.E.'s soon to be born half-sibling.

¶ 16 2. *Teresa*

¶ 17 Teresa testified that she lived in Springfield, Illinois, with her husband, two daughters, and grandson, K.E. Her daughter was Sandra. She believed it was in K.E.'s best interests to move to Norman because there were better opportunities there and it would be in his best

interests to stay with Sandra. She believed that Diego was a very hardworking person and very responsible. She had known Deon since he and Sandra met in high school and had K.E.

¶ 18        Teresa testified that she facilitated exchanges between Sandra and Deon involving K.E., which would take place at her house and at the nearby Dollar Tree. She was concerned when Deon would pick K.E. up because "every time [she] picked him up he had a very, a very strong odor of marijuana." This happened "too many times." K.E. always smelled of cannabis smoke when he came home from being with Deon. He had been dropped off by Deon on multiple occasions without his car seat. The last time she did an exchange with Deon was a year or less ago, in 2024.

¶ 19        Teresa further testified that Sandra and Diego were trying to find the best school in Oklahoma that K.E. could attend, but she did not know which school K.E. would attend there. K.E. visited Oklahoma about a month ago.

¶ 20                                3. *Alejandra*

¶ 21        Alejandra testified that she lived in Norman and was Sandra's sister. She loved and had a great relationship with K.E. Alejandra had her own two-year-old son, with whom K.E. played. She stated that K.E. calls Diego "papa" and they have a good relationship.

¶ 22        Alejandra further testified that she ran her husband's construction company in Norman. Deigo was an employee of the company, and he was paid $1,600 a week. Alejandra explained that she lived five to six minutes away from Diego's residence, where he currently lived alone. She believed it would be in K.E.'s best interests to move to Norman because there were a lot of good schools in the area and the area was very safe. She would be a support system for K.E. because she worked from home.

¶ 23        Alejandra also testified that she was aware that K.E. had an individualized

education plan (IEP) and believed that from the research she did on the schools in the area they had good programs for his IEP.

¶ 24                                              4. *Deon*

¶ 25        Deon testified that he was the father of K.E., who was his only child. Deon worked as a United Parcel Service (UPS) driver five to six days a week, typically from 7 a.m. to 2 p.m. or 4 p.m., and was paid approximately $3,600 a month. He currently rented his home from his mother. Deon acknowledged that he had never paid formal child support but testified that he began giving Sandra small amounts of money, mostly in cash, in February 2024 for her and K.E.

¶ 26        When questioned regarding K.E.'s education, medical appointments, and dentist visits, Deon was largely unaware of specific information regarding who K.E.'s teachers were, who his doctor was, or whether K.E. went to the dentist. Deon asserted that he had difficulty obtaining this information because Sandra withheld it from him. He also testified that he never smoked cannabis in his house. Further, he noted that although K.E. called him "dad," K.E. also called him by his first name because Sandra forced him to do so.

¶ 27        During cross-examination, Sandra's counsel played a video showing Deon at a strip club throwing money at nude women. Deon claimed the money in the video belonged to a friend, not him. Regarding his criminal history, Deon acknowledged he was arrested in April 2024 for stabbing a stranger while K.E. was present, although he maintained he acted in self-defense and was ultimately found not guilty at a jury trial. When asked if he was subsequently arrested for attempting to intimidate a witness in that trial, Deon initially denied it. However, after Sandra's counsel introduced an exhibit containing his mugshot, Deon admitted he was arrested for intimidation in August 2025.

¶ 28        Deon also addressed allegations of domestic violence and harassment. He denied

an alleged incident in which he hit Sandra in the face, which supposedly prompted her to move out and live with her parents. Deon maintained she would be lying if she testified that he hit her, threatened to kill her, or threw her down the stairs in front of K.E.

¶ 29                                5. *Angelie*

¶ 30        Angelie, Sandra's other sister, testified that she lived in Springfield and had a very good relationship with K.E. She recalled a specific incident in February 2023 when she was at Sandra's apartment with Sandra and K.E. Early in the morning, around 5 or 6 a.m., Deon entered the apartment and came into the bedroom with a flashlight. After he made a rude comment to Sandra, Angelie left the room, and Deon locked himself inside with Sandra. He then began hitting Sandra and dragged her out of the room. Angelie testified that Deon grabbed Sandra by her body and dragged her from the bedroom into the living room. Angelie attempted to defend her sister by grabbing a belt and hitting Deon, but he pushed her and then called the police himself. During this violent altercation, K.E. was in the room crying. By the time the police arrived, Deon had left the apartment. Angelie told the officers everything that had happened, but she noted that Sandra wanted to defend Deon because she did not want to negatively affect him at that moment.

¶ 31        Angelie also testified regarding Diego, stating that he was always respectful and demonstrated genuine care for both Sandra and K.E. She noted that Diego and K.E. had maintained a good relationship since they first met. Ultimately, Angelie expressed her belief that the relocation was in K.E.'s best interests because she believed Deon could not control himself around K.E. She explained that when Deon became angry, he acted inappropriately in front of K.E., specifically noting that on at least a couple of occasions, Deon disrespected Sandra by calling her names and belittling her in K.E.'s presence.

¶ 32                                6. *Sandra*

¶ 33    Sandra testified that she married Diego in May 2025 and was currently pregnant, with a due date of March 2026. Aside from K.E., whom she had during her senior year of high school, she had no other children. She explained that she first began living with Deon in November 2021, when K.E. was approximately three months old. During the time they lived together, Deon became violent toward her on multiple occasions. She described him as having an anger problem that caused him to act out physically. While living in Springfield, Deon threw her down the stairs twice, and he had also punched her and hit her with objects. She recounted multiple instances of physical abuse, including an incident in Chicago in 2022 or 2023 in which he damaged her car after they had already separated.

¶ 34    Sandra further testified that she never had concerns about Deon being alone with K.E. until an incident during which Deon stabbed someone in front of K.E., who was three years old at the time. She recalled that when Deon dropped K.E. off that night, Deon had a cut on his hand and there was blood on K.E.'s clothing. In addition to her concerns regarding violence, Sandra noted issues with Deon's caregiving, stating that she asked him to give K.E. medication and he refused to do so on two separate occasions. Finally, she expressed concern regarding Deon's daily cannabis use and his habit of smoking in front of K.E.

¶ 35    Regarding K.E.'s education, Sandra identified where he had gone to preschool, the names of his current and past teachers and teaching assistants, and the names of his speech therapists. As a stay-at-home mother and K.E.'s primary caretaker, Sandra prepared him for school every morning and handled all of his transportation by picking him up and dropping him off at school. She noted that Deon's mother had picked K.E. up from school only two or three times over the past year. Sandra arranged K.E.'s speech therapy entirely on her own, and Deon had no hand in that process.

¶ 36 Sandra also identified K.E.'s doctor and dentist, recounting the treatments he had received. Sandra stated that she took K.E. to these appointments and noted that Deon had not been involved in his medical care for two and a half to three years. Furthermore, the Early Learning Center hosted multiple events in the past year where parents could spend about two hours at the school with their children, but Deon never attended. Finally, Sandra testified that she coordinated all visitation through Deon's mother.

¶ 37 If allowed to relocate to Norman, K.E. would attend Jackson Elementary School. Sandra testified that her most important concern was ensuring K.E.'s IEP would transfer and she confirmed it would. Because K.E. was bilingual, she also highlighted that the new school had a specific program to accommodate him. Sandra's new residence would be two minutes away from the school, allowing her to continue personally taking him to and from his classes and speech therapy.

¶ 38 *7. The Trial Court's Decision*

¶ 39 At the end of the hearing, the trial court rendered an oral ruling, granting the petition to relocate and allocating significant decision-making authority to Sandra. The court also set forth the parenting time schedule, noting that it would not order child support and would allocate the child tax credit to Deon. The court, in great detail, discussed the best-interests factors and its findings.

¶ 40 a. Significant Decision-Making Authority

¶ 41 Regarding significant decision-making authority, the trial court found that it was in the best interests of K.E. for Sandra to be granted sole authority. The court stated that it had considered all the statutory factors, the evidence presented, and the arguments of the parties. Although the court acknowledged that K.E. had a close relationship with Deon, the court noted

that K.E. was too young to express his own wishes. In evaluating K.E.'s adjustment to his home, school, and community, the court found this factor weighed in Sandra's favor because she had been the primary parent coordinating his education and his doctor's appointments. Further, examining the prior course of conduct, the court highlighted that Sandra had historically made significant decisions for K.E., acknowledging that Deon had testified that this arrangement was due to his work schedule.

¶ 42 The trial court found credible the allegations of domestic abuse and found it credible that the parties could not work well together. The court specifically noted that there had been a breakdown in their relationship, requiring them to use an intermediary, with Sandra primarily communicating with Deon through his mother—a practice the court ordered must stop going forward. The court found credible evidence of domestic violence against Sandra when she and Deon had lived together. The court also observed that neither parent had requested joint custody; instead, each parent actively sought sole custody. Finally, the court determined that the nine-hour distance between the parties' residences made an award of sole decision-making practical, but it declined to place any restrictions on Deon's access to K.E.'s information, finding no evidence of harm to K.E. that would warrant such a limitation.

¶ 43 b. The Petition to Relocate

¶ 44 Regarding Sandra's petition to relocate, the trial court stated that it had considered all the relevant statutory factors and determined that moving to Oklahoma would enhance K.E.'s quality of life. The court noted that the relocation would allow K.E. to live with Sandra and his stepfather, which would provide greater stability than his previous arrangement of living solely with Sandra. The court found that Sandra did not seek the move to deprive Deon of his parenting time but instead to provide herself and K.E. with a better life. Specifically, the court noted that her

husband had a job in Oklahoma, and Sandra had an established support system there, consisting of her sister and brother-in-law, who owned a business in the area.

¶ 45    The trial court also addressed the parents' relationship and their respective relationships with K.E. It observed that prior to this case, Deon had not sought court-ordered overnight scheduling and had not had overnights with K.E. for a significant amount of time. The court expressed its belief that the newly ordered visitation schedule might actually improve their relationship. Although Deon would not see K.E. as often, he would have K.E. for significant, continuous periods of time, which the court believed would provide more stability. Although the court acknowledged that K.E. had a good relationship with both parents and that Deon loves and cares for him, the court emphasized that Sandra had been the one primarily coordinating K.E.'s education, medical appointments, and other daily needs. She was the parent who actively monitored his diet, enforced his bedtime, and ensured he took his medication.

¶ 46    Last, the trial court considered K.E.'s educational transition and his ties to extended family. The court noted that K.E. would attend public school in Oklahoma, just as he did in Illinois, and that his IEP would transfer. Further, testimony established that K.E. had already been to Oklahoma, demonstrating a familiarity with the area. To ensure the K.E. maintained a strong relationship with his extended Illinois family, the court deliberately structured the schedule so that K.E. would spend the majority of his major holidays in Springfield, while still benefiting from day-to-day time with his family in Oklahoma.

¶ 47    C. The Trial Court's Written Order

¶ 48    In December 2025, the trial court issued its written order, which granted the petition to relocate and allocated all decision-making to Sandra, "subject to consultation and information to [Deon]." Regarding parenting time, the order provided as follows:

"3. [Deon's] parenting time with the minor child shall be as follows:

a. Each year for Christmas Break starting the last day the minor child has school prior to Christmas and ending the last Saturday before school commences again after the Christmas break.

b. One long weekend in each month of February and March of [Deon's] choosing. [Deon] shall notify [Sandra] by October 1st of each year of his weekend(s) choice. For the year of 2026, [Deon] shall notify [Sandra] of his choice by January 15, 2026. In the event Spring Break occurs in March, [Deon] will get one long weekend in April rather than March.

c. Spring Break of each year starting the last day the minor child has school prior to the break and ending the last Saturday before school commences after the Spring Break.

d. Each summer from the second (2nd) Saturday of June through the fourth (4th) Sunday of June.

e. Each summer from the third (3rd) Saturday of July through the Saturday prior to the commencement of school in August.

f. Every Thanksgiving from the day school is out until 9:00 a.m. the Sunday following Thanksgiving.

g. At special family events with proper and reasonable notice to [Sandra].

3. [Deon] shall pick up the minor child in Norman, Oklahoma, at the residence of [Sandra] to begin his parenting time and [Sandra] shall pick up the minor child at [Deon's] residence in Springfield, Illinois, at the end of [Deon's]

- 11 -

parenting time.

4. As long as the transportation referred to in paragraph three (3) herein is adhered to, no child support shall be paid by [Deon] to [Sandra] due to the transportation costs incurred.

5. [Deon] shall be entitled to the tax dependency on the minor child commencing in 2025 since [Sandra] is not presently employed.

6. Notwithstanding [Deon's] parenting time described in paragraph three (3) herein, [Sandra], if she travels to Springfield, Illinois, shall be entitled to the following parenting time:

a. Each Christmas from 9:00 a.m. through December 26th at noon.

b. Each January 1st at noon through January 2nd at noon.

c. Each Thanksgiving Friday from 10:00 a.m. until 5:00 p.m.

7. [Deon's] parenting time is contingent upon him residing with his parents [in] *** Springfield, Illinois.

8. [Sandra] shall receive all other parenting time not allotted to [Deon].

9. [Sandra] shall be allowed to travel to Mexico for family vacations.

10. The parties herein are to communicate through the Our Family Wizard app."

¶ 49    This appeal followed.

¶ 50                              II. ANALYSIS

¶ 51    Deon appeals, arguing that the trial court erred by (1) finding it was in K.E.'s best interests to allow relocation to Oklahoma, (2) finding that granting Sandra sole decision-making authority was in K.E.'s best interests, and (3) ordering an unreasonable parenting time schedule

that fails to allow him to preserve and foster his relationship with his son. We disagree and affirm.

¶ 52                          A. The Petition To Relocate

¶ 53        Deon argues that the trial court's granting Sandra's petition to relocate was against the manifest weight of the evidence. We disagree.

¶ 54                    1. *The Applicable Law and Standard of Review*

¶ 55        Section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(g) (West 2024)) provides that, when a trial court receives a petition for permission to relocate, the court shall determine whether relocation is in the child's best interests after considering the following factors:

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>
> (4) the educational opportunities for the child at the existing location and at the proposed new location;
>
> (5) the presence or absence of extended family at the existing location and at the proposed new location;
>
> (6) the anticipated impact of the relocation on the child;
>
> (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;
>
> (8) the wishes of the child, taking into account the child's maturity and

- 13 -

ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests."

¶ 56 " 'In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64 (quoting *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25). A trial court's best-interests determination will not be reversed unless it is against the manifest weight of the evidence. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32.

¶ 57 "Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. " 'A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 (quoting *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51). We will not "reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Id.* ¶ 51.

¶ 58 2. *This Case*

¶ 59 In the present case, the trial court's decision to grant the petition to relocate was far

from arbitrary or unreasonable. Contrary to Deon's assertions, the court carefully considered all the best-interests factors and weighed them accordingly. On appeal, Deon essentially recites the best-interests factors, assigns his own factual findings to each of them, and substitutes his own views to conclude that the trial court's decision was unreasonable.

¶ 60 For example, he argues that (1) the domestic abuse allegations were not corroborated by any arrests or orders of protection, (2) Diego did not seriously look for work in Illinois, (3) Sandra's true motive was to frustrate the relationship between Deon and K.E., and (4) Sandra and Diego had not been married long enough to demonstrate stability. Ultimately, Deon argues that Sandra failed to provide any significant reason why relocation was in K.E.'s best interests, suggesting instead that the only reason for her move was her own independent happiness. However, the record affirmatively refutes this notion. The trial court explicitly found that the proposed relocation would provide stability, a better quality of life with increased income, and more quality time between Deon and K.E.; nothing in the record undermines those findings.

¶ 61 We reiterate what we wrote regarding review of a trial court's best-interests determination in *In re Marriage of Serapin*, 2017 IL App (4th) 170328-U, ¶¶ 66-68:

"The legislature requires trial courts to consider a list of 11 factors when deciding whether a proposed relocation would be in the child's best interests. 750 ILCS 5/609.2(g) (West 2016). We already have listed the factors.

Instead of considering these statutory factors anew, we consider them with a heavy measure of deference to the trial court. 'A trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.' *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988). 'A trial court's

determination is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence.' *Banister v. Partridge*, 2013 IL App (4th) 120916, ¶ 47.

The modifiers 'manifest,' 'clearly,' and 'any' signal that even if we disagreed with the trial court's decision and even if our disagreement were reasonable, that would not be enough to justify a reversal. See *People v. A Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 510 (2005). We may justifiably reverse the trial court's decision only if it is 'clearly evident' that the proposed relocation would be against [the child's] best interests or only if the record lacks evidence reasonably supporting a conclusion that the relocation would be in [his or her] best interests. *Banister*, 2013 IL App (4th) 120916, ¶ 47. Thus, if all we can say about the decision is that its weighing of the pros versus the cons is debatable and that reasonable minds could differ as to how much weight one factor deserves compared to another factor, our duty is to affirm the decision. We should reverse the decision only if it is 'arbitrary.' *Id.* Likewise, injustice that is merely arguable would not warrant a reversal; we would have to be able to say, without exaggeration, that the decision is 'manifest[ly]' unjust—that is, clearly or obviously unjust such that no fair-minded person could agree with it. *Eckert*, 119 Ill. 2d at 328."

¶ 62   In his brief, Deon simply asks us to second guess the trial court's best-interests analysis and substitute his own. However, we reiterate that we will not "reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different

conclusion may have been drawn from the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 51. Nothing in the record comes close to showing that the trial court's decision was unreasonable or arbitrary, and the opposite conclusion is not clearly apparent.

¶ 63　　　　The record of the hearing and the trial court's parenting time order show the court strongly considered Deon's objection to relocation, granting him substantial visitation time—including (1) Christmas break, (2) one long weekend in either February or March, (3) spring break, (4) two weeks in June, (5) two weeks from July into August, and (6) Thanksgiving break. Further recognizing the burden placed on Deon by requiring him to travel to Oklahoma to pick up K.E. for visitation, the court elected not to order Deon to pay child support. The court spent considerable time discussing its credibility findings and the evidence it found compelling, explicitly discussing K.E.'s extended family in both locations, the stability that would be gained in Oklahoma, the effect relocation would have on K.E.'s relationships with the parties, and K.E.'s education, among other things.

¶ 64　　　　Ultimately, the trial court's decision is well supported by the record, and nothing supports Deon's claim that the court's order was against the manifest weight of the evidence.

¶ 65　　　　　　　　　　B. Sole Decision-Making Authority

¶ 66　　　　Deon's argues that the trial court erred when allocating decision-making responsibilities. We disagree.

¶ 67　　　　　　　　　　1. *The Applicable Law and the Standard of Review*

¶ 68　　　　Section 602.5(a) of the Act provides that the trial court "shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2024). Likewise, the Illinois Supreme Court has long emphasized that "the best interests of the child is the 'guiding star' by which all matters affecting children must be decided." *In re Parentage of*

*J.W.*, 2013 IL 114817, ¶ 41. The allocation of decision-making authority is within the sound discretion of the trial court. *Sadler v. Pulliam*, 2022 IL App (5th) 220213, ¶ 42.

¶ 69        Section 602.5(c) of the Act provides the following factors for the trial court to consider when determining the best interests of the child for purposes of allocating significant decision-making responsibilities:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a

close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c)(1)-(15) (West 2024).

¶ 70    The same section of the Act explicitly prohibits the trial court from considering "conduct of a parent that does not affect that parent's relationship to the child." *Id.* § 602.5(e).

¶ 71    "The trial court must allocate decision-making responsibilities according to the child's best interests. [Citations.] In making that determination, the court must consider all relevant factors ***. [Citation.] However, the court is not required to make explicit findings on each factor or refer to every factor." *In re Marriage of Katsap*, 2022 IL App (2d) 210706, ¶ 124.

¶ 72    In child custody matters, "there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *Agers*, 2013 IL App (5th) 120375, ¶ 25. We will not overturn the trial court's decision unless it is against the manifest weight of the evidence. *Sadler*, 2022 IL App (5th) 220213, ¶ 42. A decision is against the manifest weight of the evidence where the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Young*, 2018 IL App (4th) 170001, ¶ 56.

- 19 -

¶ 73                                      2. *This Case*

¶ 74          In arguing that the trial court's decision was against the manifest weight of the
evidence, Deon asserts that the prior course of conduct between the parties showed they exercised
joint decision-making. He contends that whether the parties got along was not determinative of
whether they could jointly parent regarding major decisions and no evidence showed they had any
disagreements over the major areas of decision-making beyond relocation. He further argues that
the court gave too much weight to the allegations of domestic abuse and that Sandra was unwilling
to facilitate a relationship between him and K.E. We disagree.

¶ 75          The record shows the trial court took great care in evaluating the statutory
best-interests factors before awarding Sandra sole decision-making authority. The court concluded
the parties could not successfully exercise joint decision-making, and the evidence supports this
finding. The court explicitly found that Sandra's allegations of domestic abuse by Deon against
her were credible. Further, Deon's testimony showed he was unaware of many important details
regarding K.E.'s care, such as the names of K.E.'s doctors and teachers. Contrary to Deon's
assertions on appeal, this lack of knowledge is not itself the reason for the court's decision; instead,
it supports the court's conclusion that Sandra alone made the significant decisions in K.E.'s life.
In addition, the record shows Sandra did not communicate directly with Deon but instead
communicated through his mother. This fact is difficult to square with Deon's assertion that the
two were capable of cooperating and had, in fact, made decisions jointly.

¶ 76          Deon also argues that Sandra's move to Oklahoma proves she is unwilling to
facilitate a relationship between him and K.E. He contends she has actively tried to minimize his
involvement and replace him with Diego, noting that Sandra had K.E.'s hair styled in a similar
style to Diego's hair. However, neither Sandra's desire to relocate to live with her husband nor a

change in K.E.'s hairstyle undermines the trial court's conclusion that she has consistently facilitated a relationship between Deon and his son.

¶ 77 "It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 50. The court here made a thorough oral record of the evidence it found compelling and whom it found credible.

> "Any time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court." *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68.

¶ 78 "It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 51. Regarding the trial court's allocation of decision-making responsibility, Deon again asks this court to reweigh the evidence and reassess witness credibility, which we will not do. The trial court in this case thoroughly reviewed the applicable statutory factors in assessing the evidence. Accordingly, we conclude that the trial court's decision awarding Sandra sole decision-making authority was not against the manifest weight of the evidence.

¶ 79                                 C. Parenting Time

¶ 80 Deon argues that the trial court's finding that its parenting time allocation is in the best interests of K.E. is against the manifest weight of the evidence. He asserts the parenting schedule is inherently unreasonable and severely restricts Deon's parenting time without a valid basis. We disagree.

¶ 81                    1. *The Applicable Law and the Standard of Review*

¶ 82            A trial court must allocate parenting time according to the best interests of the child. 750 ILCS 5/602.7(a) (West 2024). In arriving at that decision, the court must consider all relevant factors, including the following:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b)(1)-(17).

¶ 83        A reviewing court will disturb a trial court's ruling on parenting time "only if it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21.

¶ 84                                              2. *This Case*

¶ 85        Deon essentially reasserts on this issue the same points he made regarding the relocation order, noting that he will see his son less often under the trial court's parenting plan and

- 23 -

miss out on important parts of K.E.'s life. He also takes issue with the court's requirement that he drive to Oklahoma to pick up K.E. when his parenting time begins.

¶ 86 We note once more that the trial court took great care in fashioning a parenting plan in the best interests of K.E., and it intended to preserve Deon's relationship with K.E. as best as it could. Although no parenting plan is perfect, the court considered all of the statutory factors and explicitly stated that the plan would provide greater quality time between K.E. and Deon compared to the frequent, short visits they were previously having.

¶ 87 Further, the trial court recognized the difficulty of traveling to Oklahoma, and for that exact reason, it chose not to order Deon to pay child support. In addition, the court explicitly provided that the transportation arrangements for parenting time could be altered if the parties found a method that worked better for them. Once again, there is no indication from the record that the trial court failed to consider any of the relevant statutory factors, or the evidence presented on those factors, in reaching its decision on parenting time.

¶ 88 In closing, we thank the trial court for its thoughtful and comprehensive oral ruling, which we found very helpful in resolving this case.

¶ 89       III. CONCLUSION

¶ 90 For the reasons stated, we affirm the trial court's judgment.

¶ 91 Affirmed.